IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| KATHLEEN HESKETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-4155-CV-C-ODS |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION REVERSING THE COMMISSIONER'S FINAL DECISION DENYING BENEFITS AND REMANDING FOR FURTHER PROCEEDINGS

After reviewing the administrative record and the parties' briefs, the Court reverses the Commissioner's final decision denying Plaintiff's application for benefits and remands the matter to the Commissioner for further proceedings.

## I. BACKGROUND

Plaintiff was born in July 1980 and has a twelfth grade education. She has prior work experience as a factory worker, cashier, waitress, and maintenance worker. In February 2001 Plaintiff began experiencing dizziness while at work and her supervisor sent her home to avoid the risk of injury. R. at 228. The dizziness continued and her employer placed her on short-term disability leave until August 2001. R. at 229-30. She testified that she tried to return to work in August 2003, but the dizziness and fainting spells (which had persisted in the interim) made working impossible. R. at 229-31. She becomes dizzy and occasionally faints upon physical exertion. As a precautionary measure, she does not drive. Plaintiff's ailment was confirmed, both at the hearing and in writing, by various lay witnesses.

The medical records confirm Plaintiff suffers from a diagnosable ailment. She reported her condition to her regular doctor (Doctor Douglas Kenney) on September 21,

2000 – or, shortly after her short-term disability benefits expired.  R. at 139.  These complaints continued over several months, with Dr. Kenney performing a variety of tests but unable to arrive at a diagnosis.  R. at 140-42.  In March 2001, Dr. Kenney referred Plaintiff to Dr. Christine Boutwell, a neurologist.   R. at 143.  Dr. Boutwell, in turn, referred Plaintiff to Dr. Linda Crouse, a cardiologist.  R. at 162.  Testing resulted in a diagnosis of neurocardiogenic syncope of the hypotensive variety[1] and Dr. Crouse prescribed a beta blocker (Midridine), which is a common treatment for this ailment.  R. at 164-71.

On April 5, 2001, Plaintiff returned to Dr. Kenney and reported the results of her visit to Dr. Crouse.  Dr. Kenney "looked up" Midridine and confirmed that it was a beta blocker "that is indicated for the orthostatic changes [Plaintiff] has experienced on the tilt table test. . . . [S]he evidently is to continue to follow with Dr. Crouse from the standpoint of how she is doing on the medication.  Obviously, she can not [sic] go back to work . . . and shouldn't be driving either."  R. at 144.

On April 16, Plaintiff reported she stopped taking the Midridine because it was causing headaches and increased dizziness, so Dr. Crouse substituted Florine and set an appointment for two weeks later.  R. at 172.  On April 27, Plaintiff called Dr. Crouse and reported she stopped taking the Florine after three days due to "continued lightheadedness and a sore throat."  R. at 173.

On May 3, 2001, Plaintiff told Dr. Kenney the medicines she had taken were not helping.  He indicated she "needs to follow with Dr. Crouse and get the syncope episodes under control and try to get . . . back toward the normal status of life."  R. at

---

[1]According to the American Heart Association, this condition "most often occurs when the blood pressure is too low (hypotension) and the heart doesn't pump a normal supply of oxygen to the brain." http://www.americanheart.org/presenter.jhtml?identifier=4749.  Treatment includes a combination of beta blockers, fludrocortisone, increased fluid and salt intake, various exercises, and other medications.  In some cases, a pacemaker is utilized.  R. Sadvosky, Vasovagal Syncope and Related Disorders, American Family Physician, April 1, 2000 (viewed at http://www.aafp.org/afp/20000401/tips/9.html).

Case 2:04-cv-04155-ODS   Document 19   Filed 09/28/05   Page 2 of 7

145.  Plaintiff next saw Dr. Crouse on May 23, at which time Dr. Crouse instructed Plaintiff to increase her salt intake to a minimum of two grams per day.  R. at 176. Plaintiff never returned to see Dr. Crouse.  Curiously, on June 6, Plaintiff told Dr. Kenney that on her last visit Dr. Crouse said "they had no other further options for her and . . . . reassured her that with time these episodes of syncope and pre syncope should gradually get better."  Dr. Kenney indicated that he did not "have much in the way of any other approach other than just simply give this time to try to improve."  R. at 146.  Dr. Kenney's plan of waiting to see if Plaintiff's condition improved continued until April 2002, at which time he referred Plaintiff to the cardiology department at the University of Missouri for a second opinion.  Plaintiff saw Dr. Lokesh Tejwani on May 14 and told him she had been treated with four different medications, none of which worked.  Dr. Tejwani indicated he wanted to see Plaintiff's medical records from Dr. Crouse because "[f]urther evaluation of symptoms would depend on what was done in the recent past."  R. at 185-86.  Plaintiff did not supply her medical records and did not return to see Dr. Tejwani.

Meanwhile, on June 13, 2002, Plaintiff returned to Dr. Kenney, who indicated he was "kind of waiting on" Dr. Tejwani to contact Plaintiff with a plan of action (which, as noted, could not happen until Plaintiff provided Dr. Tejwani with access to her medical records).  On August 29, upon questioning from Dr. Kenney, Plaintiff claimed the University of Missouri contacted her "and really didn't have anything further to offer her  . . . ."  R. at 155.  To the contrary, Dr. Tejwani wanted Plaintiff to undergo some additional testing (as well as provide her medical records), but Plaintiff "didn't seem too interested." R. at 202.  The last record of a visit to Dr. Kenney took place on January 17, 2003, at which time Dr. Kenney indicated Plaintiff's prognosis was dim and expressed uncertainty as to when or how the situation would resolve itself.  R. at 157.

In late June or early July of 2002, in response to a written inquiry, Dr. Crouse declared Plaintiff had not followed up as instructed during her May 23, 2001, visit, and she could not confirm that Plaintiff had complied with instructions to increase her salt intake.  Dr. Crouse also indicated the prognosis for controlling Plaintiff's dizziness and fainting were "good."  R. at 177.

The ALJ found Plaintiff has a documented disease or disorder that would cause the syncope and near-syncope episodes she alleges she experiences. However, he also found Plaintiff was non-compliant with, and unwilling to pursue, treatment. Treatment has been offered to her from at least two sources notwithstanding her financial condition, so her refusal is not justified by an inability to pay. The ALJ also noted the prognosis was good with treatment. R. at 19. The ALJ concluded Plaintiff is unable to climb ladders, ropes and scaffolds and should avoid using heavy machinery. Without the aid of a vocational expert (and with no explanation), the ALJ concluded Plaintiff "cannot perform her past relevant work considering her residual functional capacity." R. at 19. The ALJ then applied the Medical-Vocational Guidelines (also known as "the Grids") to determine Plaintiff could perform other work in the national economy.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

4

The Court concludes most of the ALJ's findings are amply supported by the record.[2] The record demonstrates Plaintiff has an identifiable medical condition that can be expected to cause the fainting and near-fainting episodes she has described. However, Plaintiff has not pursued treatment avenues that are available to her and she has not presented an acceptable reason for failing to follow through on those opportunities. She voluntarily abandoned both medications provided by Dr. Crouse (the latter after only three days of use), did not follow through on Dr. Crouse's recommendation that she increase salt intake, and has not returned to see Dr. Crouse. She declined the testing suggested by Dr. Tejwani, failed to arrange for her records to be delivered to him, and has refused to return to the University for further examination.

Plaintiff places a great deal of emphasis on Dr. Kenney's reports, but the ALJ was entitled to discount his statements for a variety of reasons. First, Dr. Kenney clearly was not treating Plaintiff for this malady; his notes indicate he is deferring to the cardiologist's treating decisions. Cf. Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991). Second, a specialist's opinion is entitled to greater deference than a general practitioner's opinion. E.g., Hensley v. Barnhart, 352 F.3d 353, 356 (8th Cir. 2003). Third, Plaintiff did not provide Dr. Kenney with accurate information. She reported that Dr. Crouse and Dr. Tejwani had effectively admitted defeat and indicated there was nothing more they could do for her; clearly, these representations were inaccurate.

At this juncture, the case is rather unusual: Plaintiff's condition may be controllable with treatment, but the efficacy of treatment is unknown because Plaintiff will not seek treatment. Plaintiff cannot obtain benefits by voluntarily eschewing treatment, but there

---

[2]Plaintiff also contends the ALJ erred in failing to consider her depression. The Court has not mentioned anything about this because the record demonstrates she last complained of depression in July 2000 – or almost six months before her alleged onset date, R. at 138, because there is no evidence in the record demonstrating she suffers from a severe mental impairment or any limitations due to her depression, cf. Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001), and because Plaintiff failed to identify this as a factor in her application or present evidence about it at the hearing. Cf. Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996).

is also the possibility she would be entitled to benefits even with treatment.  This places the ALJ in a difficult position: he must ascertain the likely effects of treatment on a claimant who does not want treatment.

In conducting this analysis, the ALJ determined Plaintiff could not return to her past relevant work – a curious conclusion that is not explained.  In her untreated state, Plaintiff probably cannot perform any work (an issue that was not, and need not be, decided by the ALJ).  However, it is not clear how the ALJ ascertained Plaintiff's residual functional capacity with treatment: while Plaintiff's prognosis is "good," there is no evidence establishing what this means or whether there would be any limitations on her functional capacity even if she obtained treatment.  In addition, the ALJ did not explain how he ascertained the restrictions he described, or why they preclude Plaintiff  from performing her past relevant work as a waitress, but the Court will accept the ALJ's conclusion for the sake of discussion.  The most significant problem is the ALJ's reliance on the Grids to determine Plaintiff's ability to perform work in the national economy.  The Grids may not be used if a nonexertional impairment limits the claimant's residual functional capacity.  E.g., Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).

Based on the record, Plaintiff is probably not entitled to benefits.  However, the Court cannot affirm the Commissioner on grounds not actually relied upon by the administrative agency.  E.g., Palavra v. INS, 287 F.3d 690, 693 (8th Cir. 2002) (citing Securities & Exchange Comn'n v. Chenery Corp., 318 U.S. 80, 95 (1943)).  The ALJ's conclusions regarding Plaintiff's residual functional capacity and ability to perform other work in the national economy are insufficiently explained to allow the Court to conclude they are supported by substantial evidence in the record as a whole.

6

## III.  CONCLUSION

The Commissioner's final decision denying benefits is reversed and the case is remanded for further consideration.

IT IS SO ORDERED.

                                                    /s/ Ortrie D. Smith
                                                    ORTRIE D. SMITH, JUDGE
DATE: September 28, 2005               UNITED STATES DISTRICT COURT

Case 2:04-cv-04155-ODS   Document 19   Filed 09/28/05   Page 7 of 7